**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **LATRICE ZUNIGA,** individually and on behalf of others similarly situated,<br><br>Plaintiff,<br>v.<br><br>**THE COCA-COLA COMPANY,**<br><br>Defendant. | Case No. ______________<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Latrice Zuniga ("Plaintiff" or "Ms. Zuniga"), individually and on behalf of all others similarly situated, by and through her attorneys, brings this Class Action Complaint against Defendant, The Coca-Cola Company ("Defendant" or "Coca-Cola"), and alleges upon information and belief and the investigation of counsel, except that Plaintiff's allegations as to her own actions are based on personal knowledge:

## NATURE OF THE ACTION

1. This class action challenges Defendant's false and misleading marketing of its Minute Maid Fruit Punch (the "Product")[1], which claims to contain "100% Natural Flavors" and "Made with Real Fruit Juice" (collectively, the "Representations"), sold through retail stores and online retailers nationwide. Images of the Product at issue are immediately below:

[1] Plaintiff reserves the right to amend the complete list of the Products included in this lawsuit as information arises through discovery.







2. The claim that the Product consists of "100% Natural Flavors" is false and misleading, because the Product contains a synthetic, non-natural flavoring ingredient in the form of industrially manufactured citric acid which, as Defendant's own label concedes, was added to "provide[] tartness," a flavor in the Product.

3. Despite prominently and boldly representing on the front of the package that the Product contains "100% Natural Flavors," the inclusion of manufactured citric acid, a synthetic ingredient whose function is to impart flavor (*i.e.*, tartness), belies this representation rendering it false, misleading, and in violation of the law.

4. Defendant knows that consumers are willing to pay more for products promising "100% Natural Flavors" because they perceive such products to be more natural and healthier than

products containing synthetic or artificial ingredients. Indeed, Defendant purposefully advertised its Product with the intention that consumers notice and rely on the representation that the Product consists of only (*i.e.*, 100%) "Natural Flavors."

5. Reasonable consumers, such as Plaintiff, do not have the scientific or specialized knowledge necessary to independently identify ingredients in the Product as being inconsistent with Defendant's advertised claim of "100% Natural Flavors." Rather, they must depend on the accuracy and truthfulness of Defendant's Product label.

6. Nor does the ingredient list cure the deception. The ingredient list identifies only "citric acid (provides tartness)"; it does not disclose that the citric acid is industrially manufactured, synthetic, or artificial. A reasonable consumer would expect that when Defendant labels its products as "100% NATURAL," the product's ingredients are "natural" as commonly understood and would not be contrary to the policy of any governmental regulator.

7. Throughout the applicable limitations period, Defendant has falsely represented the true nature of its Product, and as a result of this false and misleading labeling, was able to sell this Product to hundreds of thousands of unsuspecting consumers throughout Illinois and the United States.

8. Against this backdrop, Plaintiff, on behalf of herself and all other similarly situated subclass and class members, brings this Action seeking actual damages, statutory damages, restitution, pre- and post-judgment interest, and reasonable costs and attorneys' fees under state statutes and common law doctrines due to Defendant's false and misleading labeling and marketing of the Product. As a result of the misleading Representations and Defendant's failure to disclose that the citric acid in the Product is synthetic, Plaintiff and the Class Members paid a price

premium they otherwise would not have paid or purchased the Product they otherwise would not have purchased.

## JURISDICTION AND VENUE

9. This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the Class who are diverse from Defendant, and (4) there are more than 100 Class members. Plaintiff is a citizen of Illinois, and Defendant has its principal place of business in Georgia therefore, diversity exists under 28 U.S.C. § 1332(d).

10. This Court has personal jurisdiction over the Defendant because the claims asserted in this complaint arise from Defendant's contacts with this District. Defendant has been afforded due process because it has, at all times relevant to this matter, individually or through its agents, subsidiaries, officers, and/or representatives, operated, conducted, engaged in, and carried on a business venture in Illinois, and/or marketed, advertised, distributed and/or sold the Product, committed a statutory violation within Illinois related to the allegations made herein, and caused injuries to Plaintiff and the putative class members, which arose out of the acts and omissions that occurred in the state of Illinois, during the relevant period. At that time, Defendant was engaged in business activities in Illinois.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because Defendant conducts substantial business in this District, has sufficient minimum contacts with this District, and otherwise purposely avails itself of the markets in this District through the promotion, sale, and marketing of the Product in this District. Venue is also proper because Plaintiff resides in this District.

## PARTIES

*Plaintiff Latrice Zuniga*

12. Plaintiff Latrice Zuniga is an individual consumer who, at all times material hereto, is a citizen and resident of DeKalb, Illinois, residing in Illinois.

13. Plaintiff Zuniga is a frequent purchaser of Minute Maid Fruit Punch, having purchased the Product on several occasions over the past year from the Walmart store located in DeKalb, Illinois.

14. Plaintiff Zuniga reviewed and relied upon the Product's Representation made on the Product label that it consisted of "100% Natural Flavors" when purchasing. It was a material representation on which she relied in making her decision to purchase the Product.

15. Plaintiff Zuniga believed the representation on the Product's label was accurate, particularly in that it consisted of "100% Natural Flavors (*i.e.*, no synthetic or artificial flavoring ingredients).

16. Plaintiff Zuniga believed that Defendant lawfully marketed and sold the Product.

17. Plaintiff Zuniga relied on Defendant's labeling and was misled thereby.

18. Plaintiff Zuniga paid a price premium and would not have purchased the Product, or would have purchased the Product on different terms, had she known the truth about their contents.

19. Plaintiff Zuniga was injured in fact and lost money as a result of Defendant's improper conduct.

*Defendant The Coca-Cola Company*

20. Defendant, The Coca-Cola Company, is a corporation, incorporated under the laws of Delaware, with its principal place of business in Atlanta, Fulton County, Georgia. Defendant

is one of the world's largest beverage companies and the manufacturer, marketer, and seller of the Minute Maid beverage brand.

21. Defendant sells the Product throughout the United States, including Illinois. The Minute Maid Fruit Punch Product, including those purchased by Plaintiff and the proposed class members, is available at various retail and grocery stores throughout the United States, including Illinois. Defendant authorized the false, misleading, and deceptive marketing, advertising, distribution, and sale of the Product to consumers nationwide, including in Illinois.

## COMMON FACTUAL ALLEGATIONS

### I. Defendant's False and Misleading Representations

22. Defendant manufactures, markets, and sells the Product with the prominent statement, "100% NATURAL FLAVORS". The Product is sold at major retailers throughout Illinois and the United States, including Amazon and Walmart, as well as grocery stores, in various sizes, including the 59 fl oz cartons.



23. By identifying the Product as having "100% Natural Flavors," with pictures of apples, grapes, pears, and pineapple, consumers expect only natural flavors, because that is what the label says.

24. Though the ingredients listed include "Natural Flavor," they also include "Citric Acid (Provides Tartness)" which renders the statement of "100% Natural Flavors" false and misleading because the citric acid used is a synthetic ingredient which contributes to the Product's flavor.

25. The Representation appears on the Product's packaging and in listings on Amazon.com, Walmart.com, and other online platforms. The screenshots below show the Minute Maid Fruit Punch, 59 Fl Oz on Amazon.com[2] followed by the listing on Walmart.com:[3]




[2] *See*, Minute Maid Premium Fruit Punch, 59 Fl Oz https://www.amazon.com/dp/B00867XLDM?lv=shuf&channelId=500&plpRedirect=mhFallback&th=1 (last accessed on October 20, 2026).

[3] See, Minute Maid Fruit Punch Juice Drink Carton, 59 fl oz https://www.walmart.com/ip/Minute-Maid-Fruit-Punch-Real-Fruit-Juice-Drink-59-fl-oz-Carton/22176377 (last accessed on October 20, 2026).

## II. Citric Acid Is a Flavoring Ingredient in the Product.

26. Acidulants are chemical compounds that impart a sour or acidic flavor to food products while also enhancing the perception of sweetness. Citric acid is the single most widely used acidulant in food and beverage formulation. In beverages, such as the Product at issue here, citric acid adds a clean, sharp tartness.[4]

27. By Defendant's own admission, citric acid functions as a flavor in Defendant's Product, (*i.e.*, "Provides Tartness"), which is a taste and a characterizing sensory attribute of the Product.




28. While acidulants such as citric acid may also have a preservative effect, for that purpose to have been intended, Defendant, by law, would have had to disclose it. 21 C.F.R. §101.22(j) ("A food to which a chemical preservative(s) is added shall .... bear a label declaration stating both the common or usual name of the ingredient(s) and a separate description of its

---

[4] Agriculture Institute, *Acidulants in Food: Enhancing Flavor and Shelf Life*, May 28, 2025. Available at https://agriculture.institute/food-chemistry-and physiology/acidulants-in-food-flavor-shelf-life/#what-are-acidulants. (Last accessed on October 20, 2026).

function, i.e., "preservative," "to retard spoilage," "a mold inhibitor," "to help protect flavor" or "to promote color retention"). Defendant made no such declaration.

29. Additionally, this Product is pasteurized.[5] It is also considered a high acid beverage (pH 2.86) wherein microbial stability can be achieved by pasteurization, thereby obviating or minimizing the need for supplemental preservation.[6]

30. At bottom, Defendant's own admission (*i.e.*, "provides tartness"), combined with the fact that this is a highly acidic pasteurized beverage, unquestionably shows that the citric acid was intended as, and functions as, a flavoring in the Product.

## III. The Citric Acid Used in Defendant's Product is Synthetic

31. Citric acid is among the most common food additives used today. It occurs naturally in certain fruits and vegetables and historically was extracted from citrus fruits such as lemons. While "[t]he average consumer [][remains] under the impression that the added citric acid listed in the ingredients of prepared foods, beverages and vitamins is derived from natural sources such as lemons and limes," … the ingredient list is quite misleading since the added citric acid is not procured through natural sources. More accurate terminology would list this substance as manufactured citric acid ("MCA")."[7]

32. As commercial demand for citric acid increased, scientists sought alternative means to produce it and in the early 20th century discovered that citric acid could be acquired more cheaply through a chemical fermentation process – the method by which nearly all the

---

[5] *See e.g.,* https://stopandshop.com/groceries/product/minute-maid-fruit-punch-59-oz ctn/2326 ("Drink up, friend. Pasteurized. No preservatives added. 100% natural flavors"). (Last accessed October 20, 2026).

[6] Momeni, S., et al., *The pH of beverages in the United States, The Journal of the American Dental Association*, December 2015. Available at https://www.researchgate.net/publication/285672746_The_pH_of_beverages_in_the_United States

[7] Sweis, I, et al., *Potential role of the common food additive manufactured citric acid in eliciting significant inflammatory reactions contributing to serious disease states: A series of four case reports*, Toxicology Reports (2018) ("Sweis"). Available at https://pmc.ncbi.nlm.nih.gov/articles/PMC6097542/.

commercially available citric acid is produced today.[8] The overwhelming majority of this manufactured citric acid is made using a mutant strain of the black mold Aspergillus niger.[9]

33. As explained by the United States Department of Agriculture Agricultural Marketing Service ("USDA AMS"), "[t]raditionally by extraction from citrus juice, [citric acid is] no longer commercially available. It is now extracted by fermentation of a carbohydrate substance (often molasses) by citric acid bacteria, Aspergillus niger (a mold) or Candida guilliermondii (a yeast). Citric acid is recovered from the fermentation broth by a lime and sulfuric acid process in which the citric acid is first precipitated as a calcium salt and then re-acidulated with sulfuric acid."[10]

34. MCA is synthetic and artificial. As a preliminary matter, the manufacturing process for food-grade citric acid uses synthetic industrial solvents. The FDA has codified the "[s]olvent extraction process for citric acid" at 21 C.F.R. § 173.280, which provides that the "recovery of citric acid from conventional Aspergillus niger fermentation liquor may be safely used to produce food-grade citric acid in accordance with the following conditions: (a) The solvent used in the process consists of a mixture of n-octyl alcohol meeting the requirements of § 172.864 of this chapter, synthetic isoparaffinic petroleum hydrocarbons meeting the requirements of § 172.882 of this chapter, and tridodecylamine."

35. The National Organic Standards Board similarly concluded that citric acid produced by fermentation of carbohydrate substrates and purified by the lime sulfuric acid method "is synthetic because the citric acid comes into contact with lime and sulfuric acid and because of

---

[8] Independent Chemical, *Comon Uses of Citric Acid*, April 1, 2019. Available at https://independentchemical.com/blogs/common-uses-of-citric-acid-20045.aspx (last accessed October 20, 2026).

[9] Sweis, *supra* n. 4.

[10] NOSB Materials Database, Citric Acid, Chemistry. Available at https://www.ams.usda.gov/sites/default/files/media/Citric%20Acid%20TR%201995.pdf (last accessed October 20, 2026).

the chemical change from citric acid to calcium citrate and then back to citric acid during purification."[11]

36. The U.S. Environmental Protection Agency ("EPA") published a supply chain profile for citric acid that illustrates its industrial manufacturing process. The process begins with a corn substrate -- corn starch that has been enzymatically hydrolyzed into glucose syrup by industrial enzymes. A. niger is introduced and subjected to deliberate metabolic stress — trace metal starvation, excess carbon, forced low pH to produce calcium citrate. The citric acid is then recovered and refined through methods including the lime/sulfuric acid method, the solvent extraction method, or the ion exchange method – commonly using industrial chemicals such as sulfuric acid and calcium hydroxide."[12]




37. In addition to the chemical processing, the Aspergillus niger mold strains used in the production of MCA themselves have been subjected to extensive genetic modification,

[11] NOSB Materials Database, OFPA Criteria § 2119(m)3). Available at https://www.ams.usda.gov/sites/default/files/media/Citric%20Acid%20TR%201995.pdf (last accessed October 20, 2026).

[12] EPA, Citric Acid Supply Chain Profile. Available at https://www.epa.gov/system/files/documents/2023 03/Citric%20Acid%20Supply%20Chain%20Profile.pdf (last accessed October 20, 2026).

resulting in "countless generations of genetically modified mutant variants,[] specialized for industrial-scale economics."[13]

38. The U.S. Food & Drug Administration has similarly determined that MCA is not natural. The FDA has sent warning letters to food manufacturers for using the term "natural" or "all natural" on products containing citric acid. In a warning letter to Hirzel Canning Company, the FDA stated that its policy regarding the use of the term "natural" "means that nothing artificial or synthetic has been included in, or has been added to, a food that would not normally be expected to be in the food," and that "the addition of calcium chloride and citric acid to these products preclude use of the term 'natural' to describe this product."[14] The FDA issued a substantially identical warning to Oak Tree Farm Dairy, Inc., stating that the use of the terms "100% Natural" and "All Natural" was inappropriate "because it contains citric acid."[15]

39. Finally, at its most basic level, the dictionary definition of the term artificial (i.e., something made or produced by human beings through industrial processes, as opposed to occurring naturally) squarely applies to MCA. *See e.g.,* "made, produced, or done by humans especially to seem like something natural;"[16] "made by people, often as a copy of something natural."[17] Manufactured citric acid, which is produced through industrial fermentation using genetically modified mold strains, chemical solvents including synthetic petroleum hydrocarbons,

---

[13] Serge Gregoire, *Avoid citric acid: a mold byproduct!* (July 13, 2021), available at https://www.linkedin.com/pulse/avoid-citric-acid-mold-byproduct-serge-gregoire/ (last accessed October 20, 2026)

[14] *See* Shepard, C., *Natural" Food Labeling: False Advertising and the First Amendment*, 16 Marq. Elder's Advisor 173 (2014). Available at https://scholarship.law.marquette.edu/cgi/viewcontent.cgi?article=1398&context=elders; *see also*, https://malkpogolaw.com/the-hidden-truth-about-citric-acid-in-no-preservatives-products/ (last accessed on October 20, 2026).

[15] *Id*.

[16] Merriam-Webster, available at https://www.merriamwebster.com/dictionary/artificial?src=search-dict-box (last accessed on October 20, 2026).

[17] Cambridge Dictionary, Available at https://dictionary.cambridge.org/us/dictionary/english/artificial (last accessed on October 20, 2026).

and multi-step chemical extraction processes, plainly qualifies as artificial under any common understanding of the term.

40. Defendant is one of the largest beverage companies in the world and manufactures, markets, and sells the Minute Maid-branded Product at issue in this action through large-scale commercial beverage operations. Upon information and belief, given the industrial scale of its operations and its demand for citric acid, Defendant does not and cannot source the citric acid used in the Product from natural citrus fruit extraction. Indeed, like all commercial food and beverage manufacturers of its size, Defendant uses industrially manufactured citric acid produced through the Aspergillus niger fermentation process described above. The citric acid in Defendant's Product is used to impart flavor and is synthetic, rendering the front-of-package statement "100% Natural Flavors," false, misleading and deceptive.

## IV. Consumer Demand for Natural Products and Natural Flavors

41. Consumers have been increasingly concerned about the ingredients added to what they eat and drink.

42. According to the Wall Street Journal, "As consumer concern rises over artificial ingredients, more food companies are reconstructing recipes" to remove artificial flavors.[18]

43. According to Paul Manning, chairman, chief executive officer, and president of Sensient Technologies, "Consumer desire for naturally flavored products is an emerging trend."[19]

---

[18] Annie Gasparro, *How Big Food Is Using Natural Flavors to Win Consumer Favor*, Wall Street Journal. Available at https://www.wsj.com/articles/how-big-food-is-using-natural-flavors-to-win-consumer-favor-1448989427 (last accessed on October 20, 2026).

[19] Keith Nunes, Using natural ingredients to create authentic, fresh flavors, Food Business News, Sept. 20, 2018. https://www.foodbusinessnews.net/articles/12478-using-natural-ingredients-to-create-authentic-fresh-flavors (last accessed on October 20, 2026).

44. In addition, "[c]onsumers have become increasingly health conscious, and added flavors have not escaped their attention"[20] "According to a research report from Kerry titled "Beyond the Label: The Clean Food Revolution," 41% of consumers consider artificial ingredients, flavors, colors, and GMOs to be bad guys on the ingredients list, and they want to avoid them".[21]

45. Explanations for why consumers prefer foods containing natural, instead of artificial ingredients, are varied.

46. Many Americans believe that products are healthier when artificial ingredients are removed, even in "unhealthy" categories such as snacks, cake mix, and frozen pizza.

47. Consumer interest in clean labels is driven by health concerns. A recent survey found that healthfulness was among the biggest drivers of food purchasing decisions and that "limited or no artificial ingredients" is one of the top ways Americans define healthy eating.[22] Nearly 70% of consumers say they would pay more for food and beverage products with a clean label.[23]

48. Consumers seek to avoid artificial flavors for health and nutrition purposes, because they are highly processed with chemical additives in laboratories.

[20] Nena Benavides, What's in a Flavor? A Proposal to Address Consumer Confusion Surrounding Natural Flavoring (2022). Available at https://www.fdli.org/wp-content/uploads/2023/04/Benavides-FDLJ-77-4.pdf (last accessed on October 20, 2026).

[21] See https://www.wholefoodsmagazine.com/articles/2872-natural-flavor-update-making-good-for-you-taste-i-oh-so-good-i (last accessed on October 20, 2026).

[22] International Food Information Council. 2016 Food & Health Survey: consumer Attitudes toward Food Safety, Nutrition & Health, commissioned by the International Food Information Council (IFIC) Foundation. 2016 Food & Health Survey https://ific.org/wp-content/uploads/2025/04/2016-Food-and-Health-Survey-Report_ FINAL_0.pdf. (last accessed on October 20, 2026).

[23] https://www.kalsec.com/natural-food-protection/insights/clean-label-food preservation.(last accessed on October 20, 2026).

49. The trade journal, Perfumer & Flavorist, described "The Future of Artificial Flavors & Ingredients" as bleak, given consumer opposition to these synthetic ingredients.[24]

50. According to a recent natural and organic study conducted by the Acosta Group, 59% of shoppers prioritize natural and organic groceries believing that they "are better for them" (healthier) and they "tend to have fewer synthetic chemicals and additives."[25]

51. By representing the Product contains "100% Natural Flavors," Defendant seeks to capitalize on consumer preference for clean label products. In a survey undertaken by L.E.K, around 1600 consumers were asked which claims were the most important to them when buying food and drink products. Results indicated the most popular claim to be "no artificial ingredients" with "all natural" claims of almost equal import.[26]

Figure 2
Percentage of US consumers purchasing 'frequently or always' based on food claim (2018)




Note: Question: How frequently has your household purchased food with the following attributes or claims over the past 12 months when they were available?
Source: L.E.K. Consumer Survey and analysis

52. By failing to properly label its Product, Defendant has misled and deceived consumers in violation of the laws pled herein.

---

[24] Jim Kavanaugh, *The Future of Artificial Flavors & Ingredients*, Perfumer & Flavorist, June 12, 2017. https://www.perfumerflavorist.com/flavor/ingredients/article/21856245/the-future-of-artificial-flavors-ingredients .(last accessed on October 20, 2026).
[25] *See* Acost Group, Opportunities to Drive Additional Growth for Natural and Organic Products, February 20, 2025. Available at https://www.acosta.group/new-acosta-group-study-highlights opportunities-to-drive-additional-growth-for-natural-and-organic-products/ (last accessed on October 20, 2026).
[26] *See* L.E.K., https://www.lek.com/insights/ei/clean-label-food-ingredients (last accessed on October 20, 2026); Food Industry Executive, Consumers Say They Want to Eat Healthy, March 4, 2019. Available at https://foodindustryexecutive.com/2019/03/consumers-say-they-want-to-eat-healthy/ (last accessed on October 20, 2026).

53. As a result of Defendant's unlawful and deceptive conduct, Plaintiff and members of the Classes have been harmed.

## V. Defendant's Wrongful Conduct Caused Injury to Plaintiff and the Class Members.

54. Plaintiff sought to buy products that were lawfully labeled, marketed, and sold.

55. Plaintiff saw and relied on Defendant's misleading labeling of its Product.

56. Plaintiff believed that the purchased Product was made with "100% Natural Flavors."

57. Plaintiff believed that the Product was lawfully marketed and sold.

58. As a result of these unfair and deceptive practices, Plaintiff and members of the Classes (defined below) paid more money for the Product than they would have, had they known the truth.

59. Defendant knows that the claim the Product is made with "100% Natural Flavors" is material to a consumer's purchasing decision.

60. As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive representations and omissions, Defendant injured Plaintiff and the Class Members in that they: (a) paid money for products that were not as represented; (b) paid a premium price for products that were not as represented; (c) were deprived of the benefit of the bargain because the Product they purchased differed from what Defendant represented; (d) purchased the Product which was worth less than represented; (e) did not receive products that met the expectations Defendant created; (f) purchased the Product that Plaintiff and members of the Classes did not expect or consent to receive; (g) purchased the Product that does not contain "100% Natural Flavors" despite intending to buy only products represented to contain "100% Natural Flavor; and

(h) with respect to Plaintiff and members of the Illinois Class, purchased a misbranded Product that could not lawfully have been sold in Illinois.

61. Accordingly, Plaintiff and the Class Members suffered injury in fact and lost money or property because of Defendant's wrongful conduct.

## CLASS ALLEGATIONS

62. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 on behalf of the following classes (collectively, the "Classes," whose members are referred to as "Class Members").

**Illinois Class**:

> All persons in Illinois who, during the maximum period of time permitted by law, purchased Defendant's Product bearing the challenged "100 Natural Flavors" labeling described herein for personal, family, or household use and not for resale.

**Multi-State Consumer Protection Class**:

> All persons in the States of Florida, California Illinois, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New York, and Washington who, during the maximum period of time permitted by law, purchased Defendant's Product bearing the challenged "100 Natural Flavors" labeling described herein for personal, family, or household use and not for resale ("Multi-State Class" and together with the Illinois Class "Members of the Class(es)" and "Class Members").[27]

63. Excluded from the Classes are: (1) the judicial officer(s) to whom this action is assigned, and the members of their immediate families; (2) Defendant, its subsidiaries and affiliates, parents, successors, predecessors, and any entities in which Defendant or its parents and any entities in which Defendant has a controlling interest and its current or former employees,

---

[27] While discovery may alter the following, the states in the Multi-State Class are limited to those states with similar consumer fraud laws under the facts of this case: Illinois (815 Ill. Comp. Stat. 505/1, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws § 445.901, *et seq.*); Minnesota (Minn. Stat. § 325F.67, *et seq.*); Missouri (Mo. Rev. Stat. § 407.010, *et seq.*); New Jersey (N.J. Stat. § 56:8-1, *et seq.*); New York (N.Y. Gen. Bus. Law §§ 349 and 350); and Washington (Wash. Rev. Code § 19.86.010, *et seq.*). Plaintiff has standing to represent the proposed Multi-State Subclass. Any challenge brought by Defendant regarding Plaintiff's standing to represent any proposed class should be deferred to the class certification stage because that is what Illinois law requires

officers, and directors; (3) individuals who allege personal bodily injury resulting from the use of the Product; and (4) resellers of the Product.

64. Plaintiff reserves the right to amend the above definitions or to propose subclasses in subsequent pleadings and motions for class certification.

65. This action has been brought and may properly be maintained as a class action under Federal Rule of Civil Procedure 23 because there is a well-defined community of interest in the litigation, and membership in the proposed classes is easily ascertainable.

66. **Numerosity**. A class action is a superior method for the fair and efficient adjudication of this controversy, as the Members of the Classes are so numerous that joinder of all members is impractical, if not impossible. Members of the Classes may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

67. **Commonality.** Plaintiff and the Class Members share a community of interest in that there are numerous common questions and issues of fact and law which predominate over any questions and issues solely affecting individual members, including, but not necessarily limited to:

a. Whether Defendant marketed, packaged, or sold the Product to Plaintiff and those similarly situated using false, misleading, or deceptive statements or representations

b. Whether Defendant omitted or misrepresented material facts in connection with the sales of its Product;

c. Whether Defendant's labeling renders the Product misbranded under federal law;

d. Whether Plaintiff and Members of the Classes paid a price premium for the Product as a result of Defendant's misconduct;

e. Whether Defendant's Representation is deceptive practices;

f. Whether Defendant violated state consumer protection laws;

g. Whether Defendant was unjustly enriched;

h. Whether Defendant engaged in unfair or deceptive trade practices; and

i. Whether Plaintiff and the Class Members are entitled to statutory damages where authorized by the applicable state statute; and

j. Whether Plaintiff and the Members of the Classes are entitled to attorneys' fees and costs.

68. **Typicality.** Plaintiff's claims are typical of the claims of the Classes. Plaintiff and all Members of the Classes sustained damages arising out of and caused by Defendant's common course of conduct in violation of law, as alleged herein.

69. **Adequacy of Representation.** Plaintiff in this class action is an adequate representative of the Classes in that Plaintiff has the same interest in the litigation of this case as the Class Members, is committed to the vigorous prosecution of this case and has retained competent counsel who are experienced in conducting litigation of this nature.

70. Plaintiff is not subject to any individual defenses unique from those applicable to other Class Members or the Classes in their entirety. Plaintiff anticipates no management difficulties in this litigation.

71. **Superiority.** Since the damages suffered by individual Class Members, while not inconsequential, may be relatively small, the expense and burden of individual litigation by each member may make it impractical for Members of the Classes to seek redress individually for the wrongful conduct alleged herein. Should separate actions be brought or be required to be brought

by each individual member of the Classes, the resulting multiplicity of lawsuits would cause undue hardship and expense for the Court and the litigants.

72. The prosecution of separate actions would also create a risk of inconsistent rulings, which might be dispositive of the interests of the Class Members who are not parties to the adjudications and/or may substantially impede their ability to protect their interests adequately.

73. This Class Action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to Class Members, thereby supporting the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Classes in their entirety.

74. Defendant's policies and practices challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies and practices hinges on Defendant's conduct with respect to the Classes in their entirety, not on facts or law applicable only to Plaintiff.

75. Unless a Class-wide injunction is issued, Defendant may continue to act unlawfully as set forth in this Complaint.

76. Further, Defendant has acted or refused to act on grounds generally applicable to the Classes and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Federal Rule of Civil Procedure 23(b)(2).

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF STATE CONSUMER FRAUD ACTS
### (On behalf of Plaintiff and the Multi-State Class[28])

77. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

[28] Plaintiff reserves the right to amend this list of states after discovery.

78. Plaintiff brings this Count on behalf of herself and the Multi-State Class against Defendant.

79. The Consumer Fraud Acts of the States in the Multi-State Class prohibit unfair or deceptive business practices in trade or commerce. The specific laws at issue are:

a. California (Cal. Bus. & Prof. Code § 17200, et seq.);

b. Florida (Fla. Stat. § 501.201, et seq.);

c. Illinois (815 ILCS 505/1, et seq.);

d. Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*);

e. Michigan (Mich. Comp. Laws § 445.901, *et seq.*);

f. Minnesota (Minn. Stat. § 325F.67, *et seq.*);

g. Missouri (Mo. Rev. Stat. § 407.010, *et seq.*);

h. New Jersey (N.J. Stat. § 56:8-1, *et seq.*);

i. New York (N.Y. Gen. Bus. Law §§ 349 and 350); and

j. Washington (Wash. Rev. Code § 19.86.010, *et seq.*)

80. These statutes are materially similar and prohibit deceptive or unfair conduct in the course of business.

81. Defendant's uniform labeling and marketing Representation of the Product was deceptive and materially misleading.

82. Given Defendant's leading position in the beverage industry as an established and trustworthy national (even international) brand, Plaintiff and reasonable consumers trusted and relied on Defendant's Representation, sustaining damages in an amount to be proven at trial.

83. In addition, Defendant's conduct showed malice, motive, and/or reckless disregard for the truth, so an award of punitive damages is appropriate to the extent permitted by the applicable statutes.

84. Plaintiff and the other Members of the Multi-State Class have standing to pursue a cause of action for violations of the Consumer Fraud Acts of the states in the Multi-State Class because Plaintiff and members of the Multi-State Class have suffered an injury in fact and lost money because of Defendant's actions set forth herein.

**COUNT II**
**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/1, et seq. ("ICFA")**
**(On behalf of Plaintiff and the Illinois Class)**

85. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

86. Plaintiff brings this cause of action on behalf of herself and the Illinois Class Members against Defendant.

87. Plaintiff and other Class Members are persons within the context of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1(c).

88. Defendant is a person within the context of the ICFA, 815 ILCS 505/1(c).

89. At all times relevant hereto, Defendant was engaged in trade or commerce as defined under the ICFA, 815 ILCS 505/1(f).

90. Plaintiff and the proposed Class are "consumers" who purchased the Product for personal, family, or household use within the meaning of the ICFA, 815 ILCS 505/1(e).

91. The ICFA prohibits engaging in "unfair or deceptive acts or practices … in the conduct of any trade or commerce…." ICFA, 815 ILCS 505/2.

92. The ICFA prohibits any deceptive, unlawful, unfair, or fraudulent business acts or practices, including using deception, fraud, false pretenses, false promises, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact, or the use or employment of any practice described in Section 2 of the Uniform Deceptive Trade Practices Act ("UDTPA"). 815 ILCS § 505/2.

93. Defendant's conduct as alleged constitutes unfair and deceptive acts and practices violating the ICFA. Defendant engaged in deceptive marketing by misrepresenting and omitting material facts regarding the citric acid used in the Product. The representations were likely to mislead a reasonable consumer.

94. Plaintiff and the other Illinois Class Members reasonably relied upon Defendant's Representation, labeling, and omissions alleged herein regarding the "100% Natural Flavors" of the Product.

95. Defendant's misconduct, as described herein, took place within the State of Illinois and constitutes unfair or deceptive acts or practices in the course of trade and commerce, violating 815 ICFA 505/1, et seq, by representing that the Product has characteristics or benefits that it does not have.[29] Defendant also advertised the Product with intent not to sell it as advertised, in violation of 815 ILCS § 505/2 and 815 ILCS § 510/2(9).

96. Defendant engaged in fraudulent and/or deceptive conduct, which creates a likelihood of confusion or misunderstanding in violation of 815 ILCS § 505/2 and 815 ILCS § 510/2(3).

97. Defendant's uniform marketing claims were deceptive and materially misleading. Defendant named and labeled the Product as "100% Natural Flavors" in a way that would most

[29] *See,* 815 ILCS § 505/2; 815 ILCS § 510/2(7).

impact consumer choices and gain market share. Defendant knew that consumers would purchase the Product under the false belief that it contained only natural flavors.

98. As a direct and proximate result of Defendant's violations of the ICFA, as set forth above, Plaintiff and the Illinois Class Members have suffered ascertainable money losses caused by Defendant's representations regarding the"100% Natural Flavors" Representation. Had they been aware of the true nature of the Product, Plaintiff and Class Members would have paid less for the Product or would not have purchased it.

99. Based on Defendant's unfair and/or deceptive acts or practices, Plaintiff and the Illinois Class Members are entitled to relief, including restitution, actual damages, treble damages, punitive damages, costs, and attorney's fees, under 815 ILCS 505/10a.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Illinois Class)**

100. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

101. Plaintiff brings this Count on behalf of herself and the Illinois Class.

102. This claim is brought under the law of the State of Illinois.

103. This claim is brought in the alternative to the other Counts. Illinois law and the Federal Rules of Civil Procedure allow Plaintiff to plead alternative theories.

104. Defendant's conduct violated, *inter alia*, state and federal law by manufacturing, advertising, labeling, marketing, distributing, and selling Defendant's Product while misrepresenting and omitting material facts, including by making the labeling Representation alleged herein.

105. As a direct result of Defendant's deceptive conduct, it obtained unjust and inequitable benefits at the expense of Plaintiff and the Illinois Class members. Defendant's conduct violated fundamental principles of justice, equity, and good conscience. Accordingly, it would be inequitable for Defendant to retain the revenues derived from sales induced by its misleading Representation.

106. Plaintiff and the Illinois Class Members conferred financial benefits upon Defendant through retail purchases of the Product, which materially differed from the Representation made by Defendant.

107. Plaintiff and the Illinois Class members seek the imposition of a constructive trust over the profits improperly obtained by Defendant, from which Plaintiff and the Class may obtain restitution and disgorgement.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the proposed Classes, respectfully requests that the Court enter judgment in their favor and against Defendant, as follows:

a. Certifying the Illinois and Multi-State Classes pursuant to Federal Rule of Civil Procedure 23, and appointing Plaintiff and her counsel to represent the Classes;

b. Declaring that Defendant's conduct constitutes:

i. A violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 et seq.);

ii. Violations of substantially similar consumer protection statutes of other states;

iii. Unjust enrichment;

c. Awarding all actual, compensatory, statutory, and punitive damages to which Plaintiff and Class members are entitled;

d. Awarding equitable relief, including injunctive relief, restitution, and/or disgorgement of benefits unjustly retained by Defendant, to the extent authorized by applicable law;

e. Awarding reasonable attorneys' fees and costs, including expert witness fees and expenses as permitted by law;

f. Awarding pre- and post-judgment interest at the maximum rate permitted by applicable law;

g. Granting such other and further relief as this Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury of all claims so triable.

Dated: November 4, 2026

Respectfully Submitted,

*/s/ Kevin Laukaitis*

**LAUKAITIS LAW LLC**
Kevin Laukaitis (321670)
954 Avenida Ponce DeLeon
Suite 205 - #10518
San Juan, PR 00907
Phone: (215) 559-6072
Email: *klaukaitis@laukaitislaw.com*

*Attorney for Plaintiff*
*and the Putative Classes*